# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# JONESBORO DIVISION

JOANNA VERNELL HOOD                                                      PLAINTIFF

v.                           NO. 3:15-cv-00345 PSH

CAROLYN W. COLVIN, Acting Commissioner                                   DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Joanna Vernell Hood ("Hood") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Hood maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers three reasons why.[1] Hood first maintains that she has mental impairments that meet or equal Listings 12.04 and 12.06, and the ALJ erred at step three of the sequential evaluation process when he failed to so find.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

At step three, the ALJ must determine whether a claimant's impairments, when considered individually and in combination, meet or equal a listed impairment. See <u>Raney v. Barnhart</u>, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical one, see <u>Cockerham v. Sullivan</u>, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of proof, see <u>Pyland v. Apfel</u>, 149 F.3d 873 (8th Cir. 1998).

Listing 12.04 encompasses affective disorders. The required level of severity for Listing 12.04 is met when the requirements of paragraphs A and B of Listing 12.04 are shown or the requirements of paragraph C of Listing 12.04 are shown. Paragraph A of Listing 12.04 requires proof of a depressive, manic, or bipolar syndrome. Paragraph B of Listing 12.04 requires the syndrome result in at least two of the following:

> (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.

Paragraph C of Listing 12.04 requires a showing of a syndrome of at least two years' duration that has caused more than a minimal limitation of the ability to do basic work activities and one of the following:

> (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 encompasses anxiety-related disorders. The required level of severity for Listing 12.06 is met when the requirements of paragraphs A and B of Listing 12.06 are shown or when the requirements of paragraphs A and C of Listing 12.06 are shown. Paragraph A of Listing 12.06 requires proof of generalized persistent anxiety; a persistent irrational fear of a specific object, activity, or situation; recurrent panic attacks; recurrent obsessions or compulsions; or recurrent and intrusive recollections of a traumatic experience. Paragraph B of Listing 12.06 is identical to paragraph B of Listing 12.04 and need not be repeated. Paragraph C of Listing 12.06 requires a showing of a "complete inability to function independently outside the area of one's home."

The medical evidence relevant to Hood's mental impairments reflects that in the summer of 2010, she sought mental health treatment at a Mid-South Health Systems clinic on several occasions for problems stemming, in part, from her use of illegal substances. See Transcript at 562-585.[2] The progress notes reflect that she exhibited symptoms associated with depression and anxiety and occasionally heard voices. On at least two occasions, she had suicidal ideations. Counseling was recommended. In a July of 2012 progress note, Dr. Mary Wegner, M.D., ("Wegner") diagnosed Hood with, inter alia, a major depressive disorder, a methamphetamine dependence, and post-traumatic stress disorder. See Transcript at 565-566. Wegner prescribed medication.

---

[2] Hood seeks supplemental security income payments pursuant to Title XVI of the Social Security Act. The relevant period for her claim began on the date she filed her application for such payments, i.e., February 28, 2012. The Court has considered evidence prior to that date for the purpose of placing her application in context.

In January of 2011, Hood was seen by Dennis Vowell, Psy.D., ("Vowell") for a mental evaluation. See Transcript at 220-224. Hood described erratic moods, depressive symptoms, and prior suicide attempts. She was participating in outpatient mental health treatment and was taking medication. She had a history of methamphetamine dependence and described "daily IV use from the age of 27 to 37." See Transcript at 221. Vowell diagnosed Hood with a major depressive disorder, single episode moderate, and a borderline personality disorder. Vowell found no evidence, though, that Hood's mental impairments significantly affected her adaptive functioning.

In August of 2012, Hood was seen by Vowell for a second mental evaluation. See Transcript at 263-267. Hood described a depressed mood, episodes of crying, feelings of hopelessness and helplessness, and social withdrawal. She also described sleep disturbance and episodes of anxiety. She was no longer participating in outpatient mental health treatment but was compliant with her medication. She reported "significant substance abuse," noting that she had used crystal methamphetamine daily for approximately ten years. See Transcript at 264. Vowell observed that Hood's speech was clear, coherent, and without pressure or slowing, and her thought process appeared logical and goal directed. Hood did not present any "bizarre or peculiar preoccupations and denied experiences of thought withdrawal/insertion or control," and she appeared alert and fully oriented. See Transcript at 265. Vowell diagnosed Hood with a depressive disorder, not otherwise specified. With respect to the effects of Hood's mental impairment on her adaptive functioning, Vowell found the following:

> A. How do mental impairments interfere with this person's day to day [a]daptive functioning? …
>
> [Hood] does not drive. She does not go shopping alone. She is capable of managing her own finances. She has difficulty completing household chores. Daughters help with laundry and cooking meals.
>
> B. Capacity to communicate and interact in a socially adequate manner? …
>
> [Hood] appeared capable of adequate and socially appropriate communication and interaction in today's session.
>
> C. Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?
>
> [Hood] appeared to sustain a reasonable degree of cognitive efficiency and was able to track and respond to various kinds of questions and tasks without remarkable slowing or distractibility. However, in situations of mild to moderate stress it is likely she would have difficulty coping efficiently.
>
> D. Ability to attend and sustain concentration on basic tasks?
>
> As noted in the findings of the mental status exam, [Hood] generally displayed mild to moderate impairments in [her] ability to respond adequately to basic assessment of attention and concentration capacity.
>
> E. Capacity to sustain persistence in completing tasks?
>
> Persistence appeared adequate throughout the session.
>
> F. Capacity to complete work-like tasks within an acceptable time frame?
>
> [Hood] did not display remarkable psychomotor slowing. In terms of mental status type tasks, capacity to perform within a basically acceptable time frame was demonstrated.

<u>See</u> Transcript at 266-267.

Dr. Sheri Simon, Ph.D., ("Simon") reviewed Hood's medical records in August of 2012 and prepared a psychiatric review. See Transcript at 528-531, 532-544. Simon opined that Hood has mild restrictions in activites of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of an extended duration. Simon opined that Hood is capable of performing routine, repetitive tasks, specifically noting the following: "[Hood] is able to perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct, and concrete (unskilled)." See Transcript at 530. Dr. Diane Kogut, Ph.D. ("Kogut") subsequently affirmed Simon's opinions. See Transcript at 559.

Hood completed a function report in connection with her claim for supplemental security income payments. See Transcript at 132-140. She represented that a typical day consists of simply sitting around her home. See Transcript at 132. She has no hobbies, does not socialize, and has difficulty understanding, remembering, following instructions, and concentrating.

Hood testified during the administrative hearing about her mental impairments. See Transcript at 29-40. She testified that she completed the ninth grade in school, can read and write "to a degree," and can add and subtract. See Transcript at 29. Her depression prevents her from getting out of bed. Her medication helps her symptoms, but she oftentimes cannot afford the medication.

The ALJ found at step two that Hood's severe impairments include a depressive disorder. At step three, the ALJ found that Hood's impairment does not meet or equal a listed impairment, specifically noting that the impairment does not meet or equal Listing 12.04. It does not appear that the ALJ considered whether the impairment meets or equals Listing 12.06. The ALJ then assessed Hood's residual functional capacity and found that she is capable of performing light work but with the following non-exertional limitations arising from her mental impairment:

> … [Hood] is limited to not more than occasional changes to the workplace setting; and interpersonal contact is incidental to the work performed. [She] is limited to work where the complexity of the job is one or two step tasks that can be learned by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete. [She] is limited to jobs with a specific vocational preparation … of one or two that can be learned in thirty days, and the reasoning level cannot exceed one or two.

See Transcript at 13. In so finding, the ALJ gave significant weight to Vowell's opinions in his second evaluation and the opinions offered by Simon and affirmed by Kogut.

Substantial evidence on the record as a whole supports the ALJ's finding that Hood's mental impairment does not meet or equal Listing 12.04. The ALJ committed error at step three when he failed to consider whether Hood's mental impairment meets or equals Listing 12.06. The ALJ's error does not warrant a remand, though, because there is no medical evidence Hood's impairment meets or equals Listing 12.06. The Court makes the foregoing findings for five reasons.

First, the ALJ could and did find that there is no medical evidence Hood's mental impairment meets or equals paragraph B of Listing 12.04. Specifically, there is no evidence the impairment causes marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[3] Vowell's second evaluation reflects that although Hood has difficulty coping with mild to moderate stress and displays mild to moderate impairment with respect to attention and concentration, the effects of Hoods' impairment on her adaptive functioning are not marked. Additionally, Simon opined that Hood has only mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of an extended duration. Given Vowell and Simon's opinions, the ALJ could and did find no evidence of marked limitations.

---

[3]

Hood testified that she is socially withdrawn and does not want to get out of bed. See Transcript at 31, 34. She offers her testimony in support of her assertion that she has marked limitations in maintaining social functioning. Her testimony is not the type of medical evidence envisioned by the listing.

Hood offers a medical report from June of 2010 in support of her assertion that she has marked limitations in maintaining concentration, persistence, or pace. See Transcript at 583. The report is not persuasive for three reasons. First, it was prepared two years before the commencement of the relevant period. Second, the report sheds little light on her condition. Third, the medical findings contained in the report are inconsistent with Vowell and Simon's opinions.

Hood offers a medical report from June of 2010 in support of her assertion that she has had repeated episodes of decompensation. See Transcript at 584-585. She maintains that the episodes require her to miss work four or more days a month. The report is not persuasive for three reasons. First, it was prepared two years before the commencement of the relevant period. Second, the medical findings contained in the report are inconsistent with Vowell and Simon's opinions. Third, assuming the report is proof of an episode of decompensation, the episode was not for an extended duration.

Second, the ALJ could and did find that there is no medical evidence Hood's mental impairment meets or equals paragraph C of Listing 12.04. Specifically, there is no evidence the impairment causes repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Hood attempts to manufacture such evidence by maintaining that she would be required to miss work at least four days a month. There is no medical evidence, though, to substantiate her testimony. Moreover, there is no medical evidence the absences would be for extended durations, i.e., for at least two weeks in duration.

Third, there is no medical evidence Hood's mental impairment meets or equals paragraph B of Listing 12.06.[4] Vowell and Simon opined that Hood's impairment gives rise to, at most, mild to moderate limitations in certain areas of functioning, and Vowell was of the opinion that the effects of Hoods' impairment on her adaptive functioning are not marked. Thus, there is no medical evidence that Hood experiences the marked limitations required by paragraph B.

---

[4] The Court previously considered whether Hood's mental impairment meets or equals paragraph B of Listing 12.04. Because the requirements for meeting or equaling paragraph B of Listing 12.06 are identical to the requirements for meeting or equaling paragraph B of Listing 12.04, the Court will not repeat in full the previous paragraph B analysis.

Fourth, there is no medical evidence Hood's mental impairment meets or equals paragraph C of Listing 12.06. Specifically, there is no evidence that Hood has ever had a complete inability to function independently outside the area of her home. It is true that she has experienced depression and anxiety and oftentimes just wants to stay in bed. There is no medical evidence, though, to substantiate her representations, and a fair construction of Vowell and Simon's opinions indicate that she has some ability to function independently outside the area of her home.

Last, notwithstanding the ALJ's failure to consider whether Hood's mental impairment meets or equals Listing 12.06, the ALJ nevertheless incorporated the limitations caused by such an impairment into the assessment of Hood's residual functional capacity. The ALJ found that Hood's residual functional capacity is such that she can perform light work but with several non-exertional limitations.[5] The ALJ's findings take into account the effects of Hood's impairment, and the ALJ's findings are supported by substantial evidence on the record as a whole as Vowell and Simon opined that Hood is capable of such work.

---

[5]

The non-exertional limitations include the following:

… The claimant is limited to not more than occasional changes to the workplace setting, and interpersonal contact is incidental to the work performed. The claimant is limited to work where the complexity of the job is one or two step tasks that can be learned by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete. The claimant is limited to jobs with a specific vocational preparation … of one or two that can be learned in thirty days, and the reasoning level cannot exceed one or two.

See Transcript at 13.

Hood offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Hood maintains that the assessment of her residual functional capacity is flawed because her "mental impairments in combination with her chronic back pain and diabetic neuropathy" prevent her from performing light work. See Document 10 at CM/ECF at 14.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).[6]

The medical evidence relevant to Hood's residual functional capacity reflects that beginning in the summer of 2010, she sought mental health treatment on several occasions for her complaints of depression and anxiety. See Transcript at 562-585. The Court will not repeat the summary previously made of her treatment, save to note the following: Vowell and Simon opined that Hood's mental impairment gives rise to mild to moderate limitations, and Vowell was of the opinion that the effects of Hoods' impairment on her adaptive functioning are not marked.

---

[6]

As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

In August of 2010, Hood was injured in an automobile accident. See Transcript at 503-518. She complained of pain in her back and leg, and a CT scan of her lumbar spine revealed degenerative changes of the facet joints. See Transcript at 514. She continued to experience pain and sought treatment on at least four subsequent occasions, one of which was brought about when she was moving and attempted to lift too much weight. See Transcript at 227-231 (03/09/2011), 232-233 (03/11/2011), 235 (06/13/2011), 248-250 (05/15/2012). The progress notes from the visits are largely unremarkable and indicate that the severity of pain fluctuated. For instance, although mild degenerative changes continued to be noted, the treatment was conservative. In April of 2012, she presented to a clinic complaining of chest pain but denied any back pain. See Transcript at 244. When she presented to the clinic in May of 2012 complaining of back pain, she reported exercising frequently. In fact, the treatment plan at that time included the following: [m]aintain adequate level of exercise …" See Transcript at 249.

Hood also sought treatment on several occasions for chest pain. See Transcript at 390-392, 429-470 (02/16/2012); 593 (02/28/2012); 239-241 (04/10/2012); 242-243, 591-592 (04/11/2012); 396-428, 590 (04/16/2012-04/17/2012); 244-246 (04/24/2012); 587-589 (06/27/2012). The progress notes from the visits are largely unremarkable and indicate that the severity of her pain fluctuated. For instance, an EKG was performed in April of 2012, and the results were normal. On several occasions, she presented to a clinic for other reasons and denied any chest pain. See Transcript at 248, 251, 255. Hypertension and diabetes were diagnosed, and medication was prescribed.

In June of 2012, Hood attended a self-management program for the treatment of her diabetes. See Transcript at 362-368. The progress notes reflect that she was obese and having difficulty managing the symptoms associated with her diabetes. As a part of her treatment plan, she was encouraged to exercise.[7]

The non-medical evidence relevant to Hood's residual functional capacity reflects that she only worked sporadically between 1989 and 2000, never earning more than $7,700.00 in one year. See Transcript at 115. After 2000, she had no earnings.

Hood testified during the administrative hearing about her impairments. See Transcript at 29-40. She testified that she cannot drive an automobile. She takes medication that has proven to be helpful, but it makes her dizzy and sleepy. She can shower, dress, and feed herself but otherwise cannot perform day-to-day chores. She has burning and tingling in her feet, apparently caused by her diabetes.

The ALJ found at step two that Hood has severe impairments in the form of degenerative disc disease, diabetes mellitus, hypertension, obesity, and a depressive disorder. The ALJ assessed Hood's residual functional capacity and found that she is capable of performing light work with exertional and non-exertional limitations. In making the finding, the ALJ observed that "[t]reatment notes in the record do not sustain [Hood's] allegations of disabling pain." See Transcript at 16. The ALJ then found that although Hood had no past relevant work, there were jobs she could perform.

---

[7] The medical evidence also indicates that Hood has had breast cancer and a hysterectomy. She does not allege, and there is no evidence to indicate, that the impairments give rise to work-related limitations.

Substantial evidence on the record as a whole supports the ALJ's assessment of Hood's residual functional capacity. Specifically, the ALJ gave adequate consideration to Hood's mental impairments, back pain, and diabetic neuropathy, and the ALJ could and did properly find that Hood is capable of performing light work with some additional limitations. The Court so finds for three reasons.

First, the ALJ incorporated the limitations caused by a mental impairment into the assessment of Hood's residual functional capacity. The assessment takes into account the effects of Hood's impairment, and the ALJ's findings are supported by substantial evidence on the record as a whole as they are consistent with the opinions offered by Vowell and Simon.

Second, the evidence relevant to Hood's back pain is unremarkable. Although mild degenerative changes were noted in her back, the treatment for the accompanying pain was largely conservative. She was encouraged to exercise and reported on more than one occasion that she was exercising frequently. The Court accepts her representation that a typical day consists of simply sitting around her home, but there is no evidence, medical or otherwise, to support such an extreme limitation of her daily activities.

Third, the evidence relevant to Hood's diabetes is also unremarkable. Although she testified that her diabetes makes her feet tingle, burn, and go numb, the progress notes from the self-management program she attended reflect that she was encouraged to, <u>inter alia</u>, exercise. When her diabetes was noted in other progress notes, there is no mention of any meaningful work-related limitations arising from the impairment.

Hood faults the ALJ for failing to consider that Hood could not get medical care because "her Medicaid was cut-off and she has no insurance." See Document 10 at CM/ECF 15. The ALJ did not err in that regard because Hood failed to make the requisite showing. See Carrigan v. Astrue, 2009 WL 734116 at 6 (W.D.Ark. 2009) (Bryant, J.).[8]

Hood offers a third reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Hood maintains that she should have been awarded a closed period of disability. Her assertion has no merit. As the Commissioner maintains, Hood failed to state "the closed period within the adjudication period in which she believes she was disabled," and she has not shown "a disability lasting at least [twelve] months for entitlement to … a closed period." See Document 11 at CM/ECF at 9.

Given the foregoing, there is substantial evidence on the record as a whole to support the ALJ's findings. Accordingly, Hood's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 31st day of May, 2016.



UNITED STATES MAGISTRATE JUDGE

---

[8] "… the claimant's bare statement that he … is unable to afford medical treatment is not sufficient to establish that inability. … Instead, the claimant must make some showing that establishes he … was unable to afford medical treatment. … For instance, the claimant must show that he … qualifies for a Medicaid card, sought to obtain low-cost medical treatment, or was denied medical care because of his … financial condition. …" See Carrigan v. Astrue, 2009 WL 734116 at 6.